(No. 99067.—

CHATHAM FOOT SPECIALISTS, P.C., Appellant, v.
HEALTH CARE SERVICE CORPORATION, d/b/a
Blue Cross Blue Shield of Illinois, Appellee.

*Opinion filed September 22, 2005.*

Douglas L. Prochnow, John A. Roberts and Jennifer L. Baugh, of Wildman, Harrold, Allen & Dixon, L.L.P., of Chicago, for appellant.

Michael Best & Friedrich, L.L.P. (Douglass G. Hewitt and Laurel A. Haskell, of counsel), and Kevin A. Shaw, all of Chicago, for appellee.

Bell, Boyd & Lloyd, L.L.C., of Chicago (Peter M. Sfikas, of counsel), for *amicus curiae* Chicago Dental Society.

Richard Lee Stavins and Michael J. Hriljac, of Robbins, Salomon & Patt, Ltd., of Chicago, for *amicus curiae* Illinois Podiatric Medical Association.

Adrienne J. Hersh, of Highland Park, for *amicus curiae* Illinois Chiropractic Society.

JUSTICE McMORROW delivered the opinion of the court:

Plaintiff, Chatham Foot Specialists, P.C., filed a breach of contract action to recover fees against defendant, Health Care Service Corporation, d/b/a Blue Cross Blue Shield of Illinois (Blue Cross). The circuit court of Cook County granted Blue Cross' motion for summary judgment on the basis that plaintiff's failure to register as a professional service corporation with the Illinois Department of Professional Regulation (the Department), pursuant to section 12 of the Professional Service Corporation Act (Act) (805 ILCS 10/12 (West 2000)), rendered plaintiff's contract with Blue Cross void and precluded plaintiff from maintaining an action to recover fees under any legal theory. The appellate court affirmed the judgment of the circuit court. No. 1—03—3425 (unpublished order under Supreme Court Rule 23). For the reasons that follow, we reverse the judgment of the appellate court.

## BACKGROUND

The facts underlying this appeal are undisputed. Plaintiff is an Illinois professional service corporation whose purpose is to deliver podiatric services to its patients. During the time period relevant to this litigation, Dr. Mitchell M. Rosner, a licensed podiatrist, is, and has been, plaintiff's sole shareholder, officer and director. Plaintiff also has in its employment a number of additional podiatrists, who are all properly licensed to practice podiatry.

On June 1, 2000, plaintiff entered into a contractual agreement with defendant, Blue Cross. Blue Cross is in the business of providing health insurance. Under the June 2000 agreement, plaintiff contracted with Blue Cross to deliver podiatric services as a participating provider under Blue Cross' insurance plans. Blue Cross, in turn, agreed to timely pay to plaintiff fees for podiatric services provided by plaintiff to patients insured by Blue Cross. At the time plaintiff executed the agreement with Blue Cross, plaintiff was properly organized under the Act and was in good standing with the Secretary of State. However, plaintiff did not possess a current certificate of registration issued by the Department.

On November 26, 2001, Blue Cross unilaterally cancelled the agreement with plaintiff, effective December 25, 2001. On December 27, 2001, plaintiff filed a four-count complaint against Blue Cross, seeking to recover payments under the June 2000 agreement for podiatric services rendered to patients insured by Blue Cross. In count I, plaintiff alleged that Blue Cross breached the June 2000 agreement because Blue Cross failed to pay its bills due plaintiff on a timely basis. Count II of plaintiff's complaint alleged that Blue Cross engaged in fraud, in that Blue Cross intentionally misrepresented that it would pay claims for treatment of its insureds by plaintiff, causing plaintiff monetary damages. In count III of the complaint, plaintiff alleged that Blue Cross

committed unfair and deceptive acts in violation of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2 (West 2000)). Finally, count IV of plaintiff's complaint alleged that Blue Cross violated section 155 of the Illinois Insurance Code by delaying and failing to pay its claims (215 ILCS 5/155 (West 2000)).

On March 5, 2002, Blue Cross filed in the circuit court a motion to dismiss plaintiff's complaint pursuant to sections 2—615 and 2—619 of the Code of Civil Procedure (735 ILCS 5/2—615, 2—619 (West 2000)). Blue Cross alleged that, based upon the fact that plaintiff did not possess a current certificate of registration issued by the Department, plaintiff had "not complied with the mandatory licensing provisions of the Illinois Medical Practice Act and Medical Corporation Act and, therefore, under established case law, [plaintiff] is barred from maintaining an action to recover fees for medical services under any legal theory."

In response, plaintiff did not deny that it had failed to maintain a current certificate of registration with the Department. However, plaintiff asserted that its lack of compliance with the registration requirement neither violated public policy nor harmed the public welfare. According to plaintiff, neither the Medical Practice Act nor the Medical Corporation Act governed plaintiff and its practitioners. Because plaintiff is a professional service corporation incorporated for the purpose of delivering podiatric services and not medical services, plaintiff contended that only the statutory licensing requirements contained in the Podiatric Medical Practice Act of 1987 (225 ILCS 100/1 *et seq.* (West 2000)), and the administrative requirements contained in the Act (805 ILCS 10/1 *et seq.* (West 2000)) applied to plaintiff and its podiatrists.

Plaintiff noted that each podiatrist in its employ maintained a valid license to practice podiatry in Illinois, and that it therefore complied with the licensing require-

ments under the Podiatric Medical Practice Act. With respect to the administrative requirements set forth in the Act, plaintiff argued that because the Act's "certificate of registration is just an administrative mechanism to confirm that an incorporated practitioner holds a valid Illinois professional license," its lack of registration did not bar it from maintaining an action against Blue Cross.

On October 30, 2002, the circuit court denied Blue Cross' motion to dismiss without prejudice. Although the court granted plaintiff leave to file an amended complaint, plaintiff did not avail itself of this opportunity. Blue Cross thereafter filed a motion to reconsider. The circuit court denied this motion on December 16, 2002.

On April 16, 2003, Blue Cross filed in the circuit court a motion for summary judgment, pursuant to section 2—1005 of the Code of Civil Procedure (735 ILCS 5/2—1005 (West 2000)). In its summary judgment motion, Blue Cross repeated the argument that it had unsuccessfully advanced in its prior motion to dismiss. Blue Cross asserted that it was entitled to judgment on plaintiff's complaint as a matter of law because plaintiff failed to obtain a certificate of registration from the Department pursuant to section 12 of the Act (805 ILCS 10/12 (West 2000)) and, therefore, was barred from maintaining an action to recover fees for medical services under any legal theory. In addition, Blue Cross argued, because plaintiff lacked a certificate of registration, it was engaged in the unlicensed practice of medicine, an absolute bar to any right of recovery. In its motion, Blue Cross noted that plaintiff had admitted that it did not possess a certificate of registration from the Department at the time it entered into the June 2000 agreement, but that plaintiff did obtain a certificate of registration in September 2002.

In response, plaintiff reiterated the argument it had advanced in opposition to Blue Cross' earlier motion to dismiss. Plaintiff argued that its lack of compliance with

the certificate of registration requirement neither violated public policy nor harmed the public welfare. Plaintiff noted that each podiatrist in its employ maintained a valid license to practice podiatry in Illinois, that it therefore complied with the licensing requirements under the Podiatric Medical Practice Act, and that its lack of registration as a professional service corporation did not bar it from maintaining an action against Blue Cross.

On July 17, 2003, the circuit court granted Blue Cross' motion for summary judgment with respect to counts III and IV of plaintiff's complaint, wherein plaintiff asserted that Blue Cross violated provisions of the Consumer Fraud and Deceptive Business Practices Act, as well as the Insurance Code. However, the circuit court entered and continued Blue Cross' motion for summary judgment with respect to the dual claims that Blue Cross breached the June 2000 contract and engaged in fraud, allegations contained in counts I and II of plaintiff's complaint. The circuit court granted plaintiff leave to file a motion to supplement the record to submit and address any new evidence.

In its motion to supplement the record, plaintiff argued that a professional service corporation offends neither public policy nor the public welfare by performing services without a current certificate of registration. Plaintiff noted that section 12.1 of the Act addresses the operation of a professional corporation with a lapsed certificate of registration. 805 ILCS 10/12.1 (West 2000). Plaintiff observed that the only sanction imposed based upon a lapsed certificate is that the Department may require that the corporation pay a renewal fee. Plaintiff asserted that nothing in section 12.1 bars a professional service corporation from maintaining an action to recover its fees, even if the corporation lacks a current certificate of registration. In addition, according to plaintiff, when it

renewed its registration certificate in September 2002, the Department waived payment of any additional fees. This, according to plaintiff, further supported its position that the failure to maintain a current certificate of registration with the Department did not impinge upon the public safety.

In its supplemental pleading, plaintiff also introduced statistics generated by the Department that only 38% of active professional corporations and 50% of active medical corporations in Illinois possess a current certificate of registration issued by the Department. Plaintiff argued that such a widespread lack of compliance bolstered its claim that the legislature never intended the Act's certificate of registration requirement to be the vehicle for expressing public policy or protecting the public welfare. Plaintiff asserted that if the registration requirement had been intended to protect the public, the legislature would have provided a criminal penalty for noncompliance with this requirement.

In addition, plaintiff introduced a flyer created by Blue Cross which stated that Blue Cross' participating provider network encompasses over 80% of all Illinois physicians. Plaintiff surmised that, given that 50% of the medical corporations in Illinois do not have a current certificate of registration, this means that a great number of medical corporations in the Blue Cross network do not have current certificates of registration with the Department. Yet, plaintiff argued, it could be assumed that Blue Cross nevertheless paid these unregistered providers, while refusing to pay plaintiff.

On October 14, 2003, the circuit court entered a written memorandum opinion and order, granting Blue Cross summary judgment on the remainder of the counts in plaintiff's complaint. The circuit court held:

"[T]his court agrees with [Blue Cross'] analysis of the applicable case law regarding the purpose of the Illinois Medical Practice Act, Medical Corporation Act, Illinois Podiatric

Medical Practice Act and the Professional Service Corporation Act, *i.e.*, that the legislative intent behind the various licensing requirements is for the protection of the public. [Plaintiff's] failure to obtain an appropriate certificate of registration from the Department of Professional Regulation affects the public welfare. The court notes that each individual doctor could have contracted with [Blue Cross] and that those contracts would have been valid. Further, this court reviewed the supplemental evidence provided by the plaintiff in conjunction with its motion to supplement the record. This court finds that said supplemental evidence failed to show that plaintiff did in fact have the requisite certificate of registration. Although the result here is harsh, the court's analysis of the law and facts requires its finding that [plaintiff's] failure to maintain its registration precludes [plaintiff] from enforcing its contract with [Blue Cross]."

Accordingly, the circuit court granted Blue Cross' motion for summary judgment in its entirety.

On appeal, the appellate court affirmed the judgment of the circuit court. The appellate court held that the Podiatric Medical Practice Act of 1987 provides that a corporation having a purpose of practicing podiatry is required to be organized under the Act. In turn, the Act requires such a corporation to obtain a certificate of registration from the Department. The appellate court, quoting *Ransburg v. Haase*, 224 Ill. App. 3d 681, 684-85 (1992), observed that it is the general rule that courts will not enforce contracts involving a party " 'who does not have a license called for by legislation that expressly prohibits the carrying on of the particular activity without a license where the legislation was enacted for the protection of the public.' "

Finding that the terms "license" and "certificate of registration" are used interchangeably in the Act (see 805 ILCS 10/3.3 (West 2000)), the appellate court stressed that, in instances where the licensing requirements are intended to protect the public, contracts violating

statutes governing the licensing of professionals have been held to injure the public welfare and, thus, to be unenforceable under any legal theory. Citing to *Tovar v. Paxton Community Memorial Hospital*, 29 Ill. App. 3d 218, 220 (1975), the appellate court observed that it has been held that failure to comply with the licensing provisions of the Medical Practice Act precludes a party from maintaining an action for fees or services as a physician or surgeon. Quoting from *Tovar*, 29 Ill. App. 3d at 220, the appellate court concluded that because " '[t]he purpose of the statutes establishing a licensing requirement is not to generate revenue, but rather to protect the public by assuring them of adequately trained practitioners,' " it followed that " 'a person who practices medicine without obtaining the required license cannot maintain an action for his promised compensation.' " Accordingly, the appellate court held, the rule set forth in *Tovar* had similar application to the instant matter.

The appellate court also rejected plaintiff's argument that its failure to obtain a certificate of registration from the Department should be excused by the valid license to practice podiatry held by Dr. Rosner, plaintiff's sole shareholder, officer and director. The appellate court held that an essentially identical argument was rejected in *Kaplan v. Tabb Associates, Inc.*, 276 Ill. App. 3d 320, 325 (1995), where an architectural firm lacked the requisite license but the sole owner of the corporation was a licensed architect.

Finally, the appellate court rejected plaintiff's further argument, premised on *Joseph P. Storto, P.C. v. Becker*, 341 Ill. App. 3d 337 (2003), that its failure to obtain a certificate of registration did not implicate public welfare concerns and, therefore, did not render its contract with defendant void. The appellate court held that, contrary to plaintiff's assertions, the lack of criminal penalties for a violation of the registration requirement contained in

the Act is not dispositive here because, unlike the registration provisions found in our Rule 721 that apply to attorneys and was at issue in *Storto*, the statutory language of the Podiatric Medical Practice Act explicitly establishes the public safety implications of the licensing requirement for the practice of podiatric medicine. Accordingly, the appellate court held that "plaintiff's failure to obtain the requisite certificate of registration renders its contract with defendant void and precludes it from maintaining an action to recover fees under any theory."

This court granted plaintiff's petition for leave to appeal pursuant to our Rule 315 (177 Ill. 2d R. 315). We also granted leave to the Illinois Podiatric Medical Association, the Illinois Chiropractic Society, and the Chicago Dental Society to file *amicus curiae* briefs in this matter.

## ANALYSIS

A motion for summary judgment is properly granted when the pleadings, depositions, admissions, and affidavits on file establish that no genuine issue of material fact exists and, therefore, the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 2000); *Land v. Board of Education of the City of Chicago*, 202 Ill. 2d 414, 421 (2002). In ruling upon a motion for summary judgment, a court has a duty to construe the evidence strictly against the movant and liberally in favor of the nonmovant. *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 292 (2001). Although summary judgment is an efficient and useful aid in the expeditious disposition of a lawsuit, "summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). In appeals from summary judgment rulings, our review is *de novo. Travelers Insurance Co.*, 197 Ill. 2d at 292.

In the instant cause, the circuit court, pursuant to section 2—1005 of the Code of Civil Procedure (735 ILCS 5/2—1005 (West 2000)), granted Blue Cross' motion for summary judgment. The circuit court held that because plaintiff failed to obtain from the Department a certificate of registration pursuant to section 12 of the Act, plaintiff endangered the public safety and, therefore, plaintiff was precluded from enforcing against Blue Cross any contracts with respect to its provision of podiatric services. Accordingly, at issue in this appeal is whether plaintiff's lack of a current certificate of registration issued by the Department pursuant to section 12 of the Act means that plaintiff is providing podiatric services without a license, thereby rendering the June 2000 contract with Blue Cross void.

Plaintiff contends that the appellate court erred in affirming the circuit court's grant of summary judgment to Blue Cross. According to plaintiff, the appellate court improperly equated a professional service corporation's failure to register pursuant to section 12 of the Act with the unlicensed practice of podiatry. Plaintiff asserts, contrary to the holding of the appellate court, that the Act's certificate of registration requirement is not a regulatory provision enacted to protect public safety. Rather, it is an administrative provision which not only allows individual professionals to form a corporation through which they may provide their services to the public, but also functions as a means to raise revenue for the state.

According to plaintiff, the appellate court arrived at its holding by improperly reading provisions of the Podiatric Medical Practice Act (225 ILCS 100/1 (West 2000)) into the Act. Plaintiff observes that the Podiatric Medical Practice Act contains specific licensing requirements and explicitly states that its provisions are intended to protect the public health and welfare. Plaintiff emphasizes that

at all times relevant to this litigation it has been in compliance with the licensing requirements of the Podiatric Medical Practice Act, and argues that the certificate of registration requirement imposed on corporations by the Professional Service Corporation Act is unrelated to licensing. Plaintiff contends that because it is in compliance with all licensing requirements, the appellate court erred in finding that its contract with Blue Cross was unenforceable as against public policy.

In addition, plaintiff asserts, the only other appellate court decisions to interpret the scope of the Act's certificate of registration requirement rejected the analysis and conclusion arrived at by the appellate court below, and found that the Act's registration requirement is not intended to protect the public health, safety and welfare. See *Riggs v. Woman to Woman Obstetrics & Gynecology, P.C.*, 351 Ill. App. 3d 268 (2004); *Brockett v. Davis*, 325 Ill. App. 3d 727 (2001). Plaintiff concludes that there is a distinct difference between requiring an individual to obtain a license to practice a profession, which does affect the public welfare, and requiring a medical professional corporation to maintain a certificate of registration, which does not.

In support of the position taken by plaintiff in the instant cause, the Illinois Podiatric Medical Association (Podiatric Association) has filed a brief as *amicus curiae*, contending that the appellate court's decision is contrary to the plain language of the relevant statutes. According to the Podiatric Association, the Act, unlike the Podiatric Medical Practice Act, is not meant to protect public health, safety and welfare. To the contrary, the only stated legislative intent in the Act is merely to allow individuals who are already licensed under other statutes—such as the Podiatric Medical Practice Act—to operate in corporate form. See 805 ILCS 10/2 (West 2000). The Podiatric Association maintains that the

purpose of professionals operating in corporate form, pursuant to the provisions of the Act, is to obtain the protection of limited liability, as well as garner certain tax benefits. The Podiatric Association asserts that the lower courts in this case erred by mistakenly reading into the Act provisions from an entirely different statute—the Podiatric Medical Practice Act—which was expressly intended to protect public health and safety.

In addition, the Chicago Dental Society (Society) has filed an *amicus* brief with this court in support of plaintiff's position. In its submission, the Society argues that the effect of the appellate court's decision below is to void all contracts executed by professional service corporations which are unregistered pursuant to section 12 of the Act. The Society stresses that podiatrists are not the only health-care professionals who organize as professional service corporations and which have participating provider agreements with insurers. According to the Society, the decisions of the lower courts which determined these agreements to be void not only leave unregistered professional service corporations with numerous patients who now do not have insurance, but also permits the insurers to reap a substantial windfall.

The Society further argues that the appellate court below erred in holding that the Act was intended to protect the public welfare because the court relied upon cases invalidating contracts executed by medical providers who did not obtain a license to practice. Clearly, a health-care provider who does not have a license to practice cannot enter into a valid fee agreement with patients. The Society argues that in this case, however, it is merely the professional service corporation which failed to obtain an administrative certificate of registration under the Act, and issues of licensing are not involved.

In response, Blue Cross asserts that the legislature

has crafted a "statutory scheme" intended to protect the public safety, and the certificate of registration requirement is an integral part of this mechanism. Blue Cross observes that the Podiatric Medical Practice Act explicitly states that the practice of podiatric medicine affects the public health, safety and welfare, and is subject to regulation and control in the public interest. In addition, Blue Cross notes, the Podiatric Medical Practice Act also provides that any corporation that wishes to offer podiatric services to the public must be organized under the Act. Thus, Blue Cross argues, the Podiatric Medical Practice Act specifically incorporates the requirement for a certificate of registration imposed by the Act. Blue Cross therefore concludes that because the stated purpose of the Podiatric Medical Practice Act is to protect the public, the certificate of registration requirement also necessarily serves this purpose.

Blue Cross further asserts that, even if the Podiatric Medical Practice Act did not incorporate the Act into its legislative scheme, it is apparent that the Act's certificate requirement, standing alone, is also intended to safeguard the public. According to Blue Cross, "the requirement to obtain a certificate is the mechanism by which a professional service corporation is subjected to the jurisdiction of the Department," and a corporation that does not apply for a certificate thereby evades the Department's regulatory powers. Blue Cross argues that because the legislature vested the Department with oversight responsibilities to protect the public from receiving services from unlicensed individuals, the requirement that a professional service corporation obtain a certificate of registration from the Department protects public safety. We reject each of the arguments advanced by Blue Cross.

It is well settled that "courts will not aid a plaintiff who bases his cause of action on an illegal act." *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 35

(2005). More specifically, "courts will not enforce a contract involving a party who does not have a license called for by legislation that expressly prohibits the carrying on of the particular activity without a license where the legislation was enacted for the protection of the public, not as a revenue measure." *Ransburg v. Haase*, 224 Ill. App. 3d 681, 684-85 (1992); see generally Restatement (Second) of Contracts § 181 (1981) (if a party is prohibited from performing an act because the party fails to comply with a licensing requirement, "a promise in consideration of his doing that act or of his promise to do it is unenforceable on grounds of public policy if (a) the requirement has a regulatory purpose, and (b) the interest in the enforcement of the promise is clearly outweighed by the public policy behind the requirement"). Accordingly, a "contract made by an unlicensed individual calling for his personal services *** is unenforceable." *Pascal P. Paddock, Inc. v. Glennon*, 32 Ill. 2d 51, 54 (1964); *Ransburg*, 224 Ill. App. 3d at 685 ("a person practicing a profession without a license cannot recover fees for services rendered").

On numerous occasions, Illinois courts have held that where a licensing requirement has been enacted not to generate revenue, but rather to safeguard the public by assuring them of adequately trained practitioners, the unlicensed party may not recover fees for services or otherwise enforce a contract. See, *e.g.*, *Lozoff v. Shore Heights, Ltd.*, 66 Ill. 2d 398 (1977) (attorney licensed in Wisconsin but not licensed in Illinois and who represented clients in Illinois with respect to an out-of-court matter was barred from recovering fees); *Douthart v. Congdon*, 197 Ill. 349 (1902) (unlicensed grain broker was denied recovery on contract because he lacked a broker's license); *Kaplan v. Tabb Associates*, 276 Ill. App. 3d 320 (1995) (building contract was void where the defendant architectural corporation was not licensed in

Illinois); *Tovar v. Paxton Community Memorial Hospital*, 29 Ill. App. 3d 218 (1975) (physician not licensed in Illinois could not enforce employment contract with hospital).

Accordingly, in the instant appeal, our inquiry is whether the Act's certificate of registration requirement is an administrative mechanism by which professionals may provide their services in the corporate form, or whether it is a regulatory provision intended to protect the health, safety and welfare of the public. The answer to this question, in turn, determines whether plaintiff's June 2000 contract with Blue Cross is enforceable. This is a question of statutory construction.

It is well settled that the primary objective of this court when construing the meaning of a statute is to ascertain and give effect to the intent of the legislature. *In re Madison H.*, 215 Ill. 2d 364, 372 (2005). In determining legislative intent, our inquiry begins with an examination of the plain language of the statute, which is the most reliable indication of the legislature's objectives in enacting a particular law. *In re D.F.*, 208 Ill. 2d 223, 229 (2003). A keystone principle of statutory construction is to view all provisions of a statutory enactment as a whole. Accordingly, words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503 (2000). In construing a statute, we presume that the General Assembly, in its enactment of legislation, did not intend absurdity, inconvenience or injustice. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 508 (2003).

The practice of podiatry in this state is governed by the Podiatric Medical Practice Act (225 ILCS 100/1 *et seq.* (West 2000)).[1] "Podiatric medicine" or "podiatry" is defined by the Act as "the diagnosis, medical, physical,

---

[1]There appears to have been confusion in the lower courts

or surgical treatment of the ailments of the human foot with the exception of administration of general anesthetics and the amputation of the human foot." 225 ILCS 100/5(D) (West 2000). In section 1 of the Act, the General Assembly set forth a declaration of public policy with respect to the practice of podiatric medicine:

> "The practice of podiatric medicine in the State of Illinois is declared to affect the public health, safety and welfare and to be subject to regulation and control in the public interest. It is further declared to be a matter of public interest and concern that podiatric physicians and the practice of podiatric medicine as defined in this Act, merit and receive the confidence of the public, that only qualified persons be authorized to practice podiatric medicine in the State of Illinois and that no person shall practice podiatric medicine without a valid existing license to do so. This Act shall be liberally construed to best carry out these subjects and purposes." 225 ILCS 100/1 (West 2000).

Thus, the plain language of section 1 of the Podiatric Medical Practice Act provides that because the practice of podiatry affects the "public health, safety and welfare," only "qualified persons" shall be authorized to practice podiatry, and that no person shall practice podiatry without a "valid existing license" to do so.

Section 10 of the Podiatric Medical Practice Act provides that a person shall be "qualified" for licensure as a podiatric physician

> "(A) who has applied for licensure on forms prepared and furnished by the Department;
>
> (B) who is at least 21 years of age;
>
> (C) who is of good moral character. In determining moral character under this Section, the Department may take into consideration any felony conviction of the applicant,

_____

with respect to which licensing statute governed plaintiff. Because plaintiff is a professional service corporation formed for the purpose of delivering podiatric services to its patients, the provisions of the Podiatric Medical Practice Act apply.

but such a conviction shall not operate as a bar to licensure;

(D) who is a graduate of an approved college of podiatric medicine and has attained the academic degree of doctor of podiatric medicine (D.P.M.);

(E) who has successfully completed an examination authorized by the Department[2]; and

(F) who has successfully completed a minimum of one year postgraduate training as defined in Section 5 of this Act.[3] The postgraduate training requirement shall be effective July 1, 1992." 225 ILCS 100/10 (West 2000).

Accordingly, under the plain language of this section of the Podiatric Medical Practice Act, in order to be qualified to be licensed to practice podiatric medicine, an individual must satisfy each of the enumerated criteria.

If an individual does not meet all the criteria set forth in the Podiatric Medical Practice Act, that applicant will not be licensed to practice podiatry in this state. Section 11.5 of the Podiatric Medical Practice Act forbids the unlicensed practice of podiatry, and provides that

"[a]ny person who practices, offers to practice, attempts to practice, or holds oneself out to practice podiatry without being licensed under this Act shall, in addition to any other penalty provided by law, pay a civil penalty to the Department in an amount not to exceed $5,000 for each offense as determined by the Department. The civil penalty shall be assessed by the Department after a hearing is held in

---

[2]Section 9 of the Podiatric Medical Practice Act states that the "Department shall authorize examinations of applicants as podiatric physicians," and that the "examination of applicants shall be of a character to give a fair test of the qualifications of the applicant to practice podiatric medicine." 225 ILCS 100/9 (West 2000).

[3]Section 5(G) of the Act defines "[p]ostgraduate training" as a "minimum one year postdoctoral structured and supervised educational experience approved by the Council on Podiatric Medical Education of the American Podiatric Medical Association which includes residencies and preceptorships." 225 ILCS 100/5(G) (West 2000).

accordance with the provisions set forth in this Act regarding the provision of a hearing for the discipline of a licensee." 225 ILCS 100/11.5(a) (West 2000).

The General Assembly allows the practice of podiatry by individuals who have formed a corporation, as long as certain requirements are satisfied. Section 22 of the Podiatric Medical Practice Act provides that:

"No license shall be issued by the Department to any corporation (i) that has a stated purpose that includes podiatry, or (ii) that practices or holds itself out as available to practice podiatry unless it is organized under the *Professional Service Corporation Act.*" (Emphasis added.) 225 ILCS 100/22 (West 2000).

Accordingly, we turn to a review of the relevant provisions of the Act. By enacting the Act, the legislature provided for the organization of a particular class of business corporation. In section 4 of the Act, the General Assembly indicated that there is a close parallel between the attributes of a traditional corporation and those of a professional corporation:

"The 'Business Corporation Act of 1983' *** shall be applicable to professional corporations organized under this Act, and they shall enjoy the powers and privileges and be subject to the duties, restrictions, and liabilities of other corporations, except where inconsistent with the letter and purpose of this Act." 805 ILCS 10/4 (West 2000).

In section 2 of the Act, the legislature set forth the following stated intent:

"It is the legislative intent to provide for the incorporation of an individual or group of individuals to render the same professional service or related professional services to the public for which such individuals are required by law to be licensed or to obtain other legal authorization, while preserving the established professional aspects of the personal relationship between the professional person and those he serves professionally." 805 ILCS 10/2 (West 2000).

Thus, in enacting the Act, the General Assembly intended to allow one or more individuals, each of whom is "licensed" to perform the same professional or related

professional services, to form a "professional service corporation" through which they may render these same professional services to the public.

In turn, the term "professional service corporation" is defined in section 3.4 of the Act:

"a corporation organized under this Act solely for the purpose of rendering one category of professional service or related professional services and which has as its shareholders, directors, officers, agents and employees (other than ancillary personnel) only individuals who are duly licensed by this State *** to render that particular category of professional service or related professional services ***." 805 ILCS 10/3.4(a) (West 2000).

The Act defines the term "license" to include "a license, certificate of registration or any other evidence of the satisfaction of the requirements of this State *** for the practice of a professional service." 805 ILCS 10/3.3 (West 2000). "Professional service" is defined in the Act as "any personal service which requires as a condition precedent to the rendering thereof the obtaining of a license from a State agency." 805 ILCS 10/3.5 (West 2000). In section 7 of the Act, the legislature further provides that

"No corporation organized and incorporated under this Act may render professional services, except through its officers, employees and agents who are duly licensed *** to render such professional services within this State." 805 ILCS 10/7 (West 2000).

Section 12 of the Act sets forth the requirement for a certificate of registration, as well as the procedures for obtaining the certificate, the fee for the certificate, certificate renewal procedures, and a posting requirement:

"No corporation shall open, operate or maintain an establishment for any of the purposes for which a corporation may be organized under this Act without a certificate of registration from the regulating authority authorized by law to license individuals to engage in the profession or

related professions concerned. Application for such registration shall be made in writing, and shall contain the name and address of the corporation, and such other information as may be required by the regulating authority. Upon receipt of such application, the regulating authority, or some administrative agency of government designated by it, shall make an investigation of the corporation. *** If such authority finds that the incorporators, officers, directors and shareholders are each licensed pursuant to the laws of Illinois to engage in the particular profession *** and if no disciplinary action is pending before it against any of them, and if it appears that the corporation will be conducted in compliance with the law and the regulations and rules of the regulating authority, such authority, shall issue, upon payment of a registration fee of $50, a certificate of registration.

Upon written application of the holder, the regulating authority which originally issued the certificate of registration shall renew the certificate if it finds that the corporation has complied with its regulations and the provisions of this Act.

The fee for the renewal of a certificate of registration shall be calculated at the rate of $40 per year.

The certificate of registration shall be conspicuously posted upon the premises to which it is applicable, and the professional corporation shall have only those offices which are designated by street address in the articles of incorporation, or as changed by amendment of such articles. No certificate of registration shall be assignable." 805 ILCS 10/12 (West 2000).

In section 12.1 of the Act, the legislature addresses situations in which a professional service corporation allows its certificate of registration to lapse. Although this section refers to certificates that have lapsed as a result of the professional service corporation paying fees to the Department with a check returned for insufficient funds, we nevertheless find its provisions relevant. Section 12.1 states that if

"the corporation whose certificate of registration has lapsed continues to practice as a corporation without pay-

ing the renewal fee and the $50 fee required under this Section, an additional fee of $100 shall be imposed for practicing without a current license. The Department shall notify the corporation whose certificate of registration has lapsed, within 30 days after the discovery by the Department that such corporation is operating without a current certificate, that the corporation is operating without a certificate, and of the amount due to the Department which shall include the lapsed renewal fee and all other fees required by this Section. If after the expiration of 30 days from the date of such notification, the corporation whose certificate has lapsed seeks a current certificate, it shall thereafter apply to the Department for reinstatement of the certificate and pay all fees due to the Department. The Department may establish a fee for the processing of an application for reinstatement of a certificate which allows the Department to pay all costs and expenses incident to the processing of this application. The Director may waive the fees due under this Section in individual cases where he finds that in the particular case such fees would be unreasonable or unnecessarily burdensome." 805 ILCS 10/ 12.1 (West 2000).

Furthermore, section 13 of the Act provides that the regulating authority which issued the certificate of registration may suspend or revoke it for several reasons, one of which is "[t]he revocation or suspension of the license to practice the profession of any officer, director, shareholder or employee not promptly removed or discharged by the corporation." 805 ILCS 10/13 (West 2000). Finally, in section 14 of the Act, the legislature sets forth the procedures for renewing a certificate of registration. The corporation shall file with "the appropriate regulating authority a certificate giving the name and residence address of all shareholders as of the last day of the month preceding such filing, and certifying that all such shareholders are duly licensed to render the same professional services or related professional services as those for which the corporation was organized." 805 ILCS 10/14 (West 2000).

Upon reviewing the relevant provisions of the Podiatric Medical Practice Act and the Act, we agree with plaintiff that the requirement imposed by section 12 of the Act on professional service corporations to obtain a certificate of registration was not enacted as a regulatory measure to protect the public health, safety and welfare. We hold that the appellate court erred in concluding that the terms "license" and "certificate of registration" are synonymous, as nothing in the relevant statutory provisions supports the appellate court's interpretation that a "license" and a "certificate of registration" are functionally equivalent. We believe that the correct interpretation of the scope and purpose of the Act's certificate of registration requirement was set forth in *Riggs v. Woman to Woman, Obstetrics & Gynecology, P.C.*, 351 Ill. App. 3d 268 (2004), a case that was decided subsequent to the filing of the appellate court's unpublished order in the matter at bar.

*Riggs* addressed the issue of whether the plaintiff, a physician, was bound by a covenant not to compete with the defendant, a professional service corporation, on the basis that the defendant's failure to obtain a certificate of registration from the Department pursuant to section 12 of the Act rendered the employment agreement void *ab initio*. The trial court ruled in the plaintiff's favor, finding that the Act was intended to regulate the practice of medicine and protect the public health and safety. Accordingly, the trial court held that because the defendant had failed to obtain a certificate of registration in compliance with the Act, the defendant was therefore not authorized to practice medicine, and the agreement between the parties was against public policy and void *ab initio*. However, finding that there was substantial ground for difference of opinion with respect to its legal conclusion, and that an immediate appeal could materially advance the ultimate termination of the litigation,

the trial court certified two questions for review to the appellate court, pursuant to our Rule 308 (155 Ill. 2d R. 308): whether the Act's certificate of registration requirement for medical corporations is intended to protect the public's health, safety or welfare; and whether the defendant's failure to comply with the Act's certificate of registration requirement rendered the employment agreement void *ab initio*. The appellate court answered both questions in the negative.

First, the *Riggs* court held that there was nothing in the Act that supported the conclusion of the trial court that the General Assembly enacted the Act for the protection of the public. The *Riggs* court found that "[i]t is clear, based on a reading of the entire Act, that the function of the Act is primarily permissive, allowing professionals, who would otherwise not be entitled to enjoy the benefits of incorporating, to establish corporate entities for their professional practices." *Riggs*, 351 Ill. App. 3d at 272.

In support of this conclusion, the court in *Riggs* explained:

"It is generally recognized that professional service corporation legislation, similar to the Act, arose 'out of the desire of professional groups to realize the tax benefits open to employees under the qualified pension, profit-sharing, and annuity plan provisions of the Internal Revenue Code.' J. Rydstrom, *Practice by Attorneys & Physicians as Corporate Entities or Associations Under Professional Service Corporation Statutes*, 4 A.L.R. 3d 383, 385 (1965); see also 18 Am. Jur. 2d *Corporations* § 37 (2003). In addition to providing certain tax breaks, incorporation under the Act reduces potential civil liability. See 805 ILCS 10/8 (West 2002). Clearly, the intent of the legislature here is not to advance the public welfare but to allow professionals to incorporate in order to enjoy certain tax benefits and to reduce their potential civil liability." *Riggs*, 351 Ill. App. 3d at 272.

Further, the *Riggs* court rejected the plaintiff's argu-

ment that the defendant's lack of a certificate of registration under the Act to practice as a professional service corporation equated with the lack of a license to practice medicine. The court in *Riggs* emphasized that there is a clear difference between these two concepts, because "those statutes requiring licenses to practice a profession are necessary for the public safety because they have been enacted to provide assurance of adequately trained professionals." In contrast, "[a] violation of the Act does not necessarily mean that the doctors lack the requisite medical skills to practice medicine." *Riggs*, 351 Ill. App. 3d at 273. Thus, the *Riggs* court concluded that because nothing in the plain language of the Act signifies that it was enacted for the benefit of the health, safety and welfare of the public, the defendant's failure to comply with the Act's registration requirement did not render the employment agreement void *ab initio*.

We adopt the analysis of the Act set forth by the court in the *Riggs* decision. Accordingly, we reject the argument advanced by Blue Cross, based upon the appellate court's holding below, that when the Act and the Podiatric Medical Practice Act are read in concert, it is evident that a "license" and a "certificate of registration" are functionally equivalent. Blue Cross premises this argument upon the General Assembly's statement of legislative intent that the Podiatric Medical Practice Act was enacted to protect the "public health, safety and welfare." 225 ILCS 100/1 (West 2000). According to Blue Cross, the legislature's intent that the certificate of registration requirement found in the Act is for the protection of the public is evinced by section 22 of the Podiatric Medical Practice Act, which allows the practice of podiatry by professional service corporations, and mandates that:

"No license shall be issued by the Department to any corporation (i) that has a stated purpose that includes podiatry, or (ii) that practices or holds itself out as available to practice podiatry unless it is organized under the

Professional Service Corporation Act." 225 ILCS 100/22 (West 2000).

Blue Cross argues that the reference to a corporate "license" in this section of the Podiatric Medical Practice Act refers to the Act's "certificate of registration" requirement. Blue Cross reasons that because the Podiatric Medical Practice Act was enacted to protect the public, and because section 22 of that Act incorporates the Act by reference, this leads to the conclusion that the Act's certificate of registration requirement was similarly intended to protect the public. We disagree.

Comparison of the statutory prerequisites for a certificate of registration under the Act with those to obtain a license under the Podiatric Medical Practice Act reveals that a corporate certificate of registration and a license to practice podiatry are not functionally equivalent. To obtain a license to practice podiatry, the Podiatric Medical Practice Act requires that an individual must be at least 21 years of age, of good moral character, and a graduate of an approved podiatric medical school. 225 ILCS 100/10 (West 2000). The individual must also have obtained a doctorate in podiatric medicine, passed an examination authorized by the Department, and finished at least one year of postgraduate training besides completing the application and paying a $400 fee. 225 ILCS 100/10, 18 (West 2000). In sum, in order to obtain a "license" to practice podiatry, the Podiatric Medical Practice Act requires the applicant to prove competency in that profession.

In contrast, a professional service corporation may obtain a "certificate of registration" under the Act simply by completing an application and paying a $50 registration fee. 805 ILCS 10/12 (West 2000). The Act imposes no requirement that any separate professional training be completed, nor that any separate professional examination be conducted. The Act does require, however, that the individuals seeking to organize as a professional

service corporation be licensed, stating that "[n]o corporation shall open, operate or maintain an establishment for any of the purposes for which a corporation may be organized under this Act without a *certificate of registration* from the regulating authority authorized by law *to license individuals to engage in the profession.*" (Emphases added.) 805 ILCS 10/12 (West 2000). In other words, the Act provides that an individual or group of individuals, who are currently "licensed as individuals to engage in the profession," may form a professional service corporation through which they may provide their services to the public. There is no need for the legislature to require that the individuals forming the professional service corporation be *licensed* as a prerequisite to that corporation obtaining a *certificate of registration* unless a license and a certificate of registration are two separate concepts which serve two distinct purposes. For example, an individual who is unlicensed to practice a profession in an individual capacity does not become "licensed" simply by virtue of being part of a professional service corporation that holds a current certificate of registration issued by the Department. Conversely, a duly licensed professional does not become "unlicensed" simply because that individual provides services through an unregistered professional service corporation.

In further support of its argument that the terms "license" and "certificate of registration" are functionally equivalent, Blue Cross points to section 3.3 of the Act (805 ILCS 10/3.3 (West 2000)), which defines the term "license" to include a "certificate of registration." Although Blue Cross is correct that the Act includes a "certificate of registration" within the definition of a "license," its argument that the two terms are interchangeable is belied when the entire context of the definition is examined. Section 3.3 of the Act defines "license" as "a license, certificate of registration or any other

evidence" that establishes "the satisfaction of the requirements of this State *** for the *practice* of a professional service." (Emphasis added.) 805 ILCS 10/3.3 (West 2000). Thus, pursuant to the plain language of section 3.3, anything deemed evidence of satisfying the state requirements to lawfully *practice* a profession falls within the definition of a "license." It logically follows, therefore, that anything called a "certificate of registration" which does *not* demonstrate the satisfaction of state requirements to practice a profession is not a "license" under the Act.

The fundamental distinction between an individual's "license" to practice a profession and a professional service corporation's "certificate of registration" granted by the Department is underscored in several additional sections of the Act. For example, section 2 of the Act contains the legislature's intent that the Act is to provide for the "incorporation of an individual or group of individuals to render the same professional service or related professional services to the public *for which such individuals are required by law to be licensed or to obtain other legal authorization.*" (Emphasis added.) 805 ILCS 10/2 (West 2000). This language reveals that the General Assembly intended to allow an individual or a group of individuals who obtain a certificate of registration to deliver, as a corporation, the services for which *each individual* has been *licensed* to practice.

Similarly, the difference between a "license" and a "certificate of registration" is reflected in section 3.4 of the Act, which defines a "professional service corporation" as an organization wherein its shareholders, directors, officers, agents and employees must be "duly *licensed* by this State *** to render that particular category of professional service or related professional services." (Emphasis added.) 805 ILCS 10/3.4(a) (West 2000). This distinction is also underscored in the Act's definition of

"professional service" as any personal service which requires as a condition precedent "the obtaining of a *license* from a State agency." (Emphasis added.) 805 ILCS 10/3.5 (West 2000). The Act also mandates that no professional service corporation may render professional services "except through its officers, employees and agents who are duly *licensed* \*\*\* to render such professional services within this State." (Emphasis added.) 805 ILCS 10/7 (West 2000).

In addition, the distinction between a license and a certificate of registration is highlighted in section 13 of the Act, which provides that a certificate of registration may be suspended or revoked upon "[t]he revocation or suspension of the *license to practice* the profession of any officer, director, shareholder or employee not promptly removed or discharged by the corporation." (Emphasis added.) 805 ILCS 10/13 (West 2000). Finally, in renewing the certificate of registration, the corporation shall certify, *inter alia*, that all shareholders "are duly *licensed* to render the same professional services or related professional services as those for which the corporation was organized." (Emphasis added.) 805 ILCS 10/14 (West 2000).

Upon review of the above-cited statutory provisions, it is clear that the *individuals* who form the professional service corporation must be licensed to practice the profession. As stated, for podiatrists, the licensing requirements are set forth in the Podiatric Medical Practice Act. Accordingly, the licensing provisions of the Podiatric Medical Practice Act are regulatory and protect the public welfare by assuring the public of adequately trained professionals. In the matter before us, it is uncontradicted that all of the podiatrists in the employ of plaintiff were in compliance with the licensing requirements of the Podiatric Medical Practice Act.

In contrast to the Podiatric Medical Practice Act, the

provisions of the Act do not assure professionalism and competence in the practice of podiatry. Rather, the Act provisions underscore that the professional service corporation is simply the vehicle by which the General Assembly allows licensed individuals to practice their profession in the corporate form, and thereby reap the benefits of incorporation. We agree with *Riggs* that the function of the Act is "primarily permissive, allowing professionals, who would otherwise not be entitled to enjoy the benefits of incorporating, to establish corporate entities for their professional practices." *Riggs*, 351 Ill. App. 3d at 272. Incorporation allows not only limited liability—which shields the corporation's shareholders from personal liability for the torts of the other officers, directors, shareholders and employees—but also offers various tax benefits. *Riggs*, 351 Ill. App. 3d at 272.

Although the Podiatric Medical Practice Act incorporates the Act by reference, we reject Blue Cross' argument that this means that the requirements set forth in the Act were intended to protect the public. If this argument is extended to its logical conclusion, it would mean that not only is the Act's certificate of registration requirement intended to protect the public, but so too are the Act's other administrative requirements, such as those for electing a board of directors, for specifying the number and types of officers that a professional service corporation may have, for limiting the abbreviations a professional service corporation may use in its name and for registering an assumed name. 810 ILCS 10/9, 10, 12 (West 2000). None of these requirements implicate public safety. We will not interpret a statute so as to achieve an absurd result. *Cryns*, 203 Ill. 2d at 280 (in construing a statute, we presume that the General Assembly, in its enactment of legislation, did not intend absurdity, inconvenience or injustice).

In addition, Blue Cross further argues that the

requirement that a professional service corporation obtain a certificate of registration from the Department is for the protection of the public health, safety and welfare because the Department was created solely for the protection of the public. In support of this argument, defendant relies upon provisions in the Civil Administrative Code which created the Department and which reflect the legislature's intent:

"The practice of the regulated professions, trades and occupations in Illinois is hereby declared to affect the public health, safety, and welfare of the People of the State and in the public interest is subject to regulation and control by the Department of Professional Regulation." 20 ILCS 2105/2105—10 (West 2000).

Thus, defendant asserts, the appellate court below properly held that the certificate requirement is for the protection of the public welfare, and not merely a revenue-generating mechanism. We disagree. Giving the Department administrative oversight of the Act's certification requirement does not mean that the legislature intended for the Act to protect the public. We agree with the court in *Riggs* that the Act "assigns only minor, administrative functions to the [Department], whose tasks are more ministerial than regulatory." *Riggs*, 351 Ill. App. 3d at 272.

Indeed, the court in *Riggs* correctly noted there are no civil or criminal penalties contained within the Act for noncompliance with the certificate of registration requirement, and that such penalties would indicate that the provision was enacted because it had a significant impact on the public welfare. *Riggs*, 351 Ill. App. 3d at 272. The *Riggs* court also correctly observed that the only enforcement authority provided to the Department under the Act is the Department's ability to revoke a certificate of registration (805 ILCS 10/13 (West 2000)), or to collect an additional $100 fee when a professional service corporation's certificate of registration lapses and

it continues to practice without a current certificate. 805 ILCS 10/12.1 (West 2000). This fee, however, is not mandatory and may be waived by the Director of the Department if its imposition would be "unreasonable or unnecessarily burdensome." 805 ILCS 10/12.1 (West 2000). Notably, in the matter before us, the Department did not pursue any action against plaintiff as a result of its failure to maintain a current certificate of registration. In fact, the record reflects that when plaintiff renewed its certificate of registration in September 2002, the Department waived payment of any additional fees. In addition, nowhere in the Act did the legislature suggest that contracts with an otherwise valid professional service corporation should be voided because the corporation did not maintain a current certificate of registration. We conclude that the Department's limited administrative power to enforce the Act is yet another indication that the Act's certification of registration requirement was not intended to protect the public.

In sum, viewing, as we must, the provisions of the Act as a whole (*Michigan Avenue National Bank*, 191 Ill. 2d at 504), we hold that the term "certificate of registration" as used in the Act is not functionally equivalent to a license to practice a profession, and that there is nothing in the Act to indicate that the requirement of a professional service corporation to maintain a current certificate of registration was enacted to protect the public safety. We believe that if the General Assembly had intended for the provisions of the Act to protect the public welfare, the legislature would have said so, just as it has explicitly stated in the Podiatric Medical Practice Act that the licensing requirements for podiatrists are meant to ensure the public health, safety and welfare. In the instant matter, there is no dispute that the podiatrists were duly licensed to practice podiatry in accordance with the Podiatric Medical Practice Act. Therefore, it

was error for the lower courts to hold that plaintiff's June 2000 contract with Blue Cross requiring Blue Cross to reimburse plaintiff for fees charged for podiatric services to Blue Cross' insureds was unenforceable as against public policy. The goal of protecting the public was not implicated by the facts in the instant cause.

Our holding in the matter before us is further supported by, and consistent with, our recent decision in *Ford Motor Credit Co. v. Sperry*, 214 Ill. 2d 371 (2005), which addressed facts analogous to those in the case at bar. In that case, we addressed the issue of whether a judgment obtained by a duly licensed attorney who worked for a law firm that had failed to register as a professional service corporation with this court, as required by our Rule 721(c) (166 Ill. 2d R. 721(c)), was null and void *ab initio*. We held that the lower courts in that case had erred by holding that a duly licensed attorney who was a member of a law firm that lacked a Rule 721(c) registration had, solely by virtue of the unregistered nature of the firm, engaged in the unauthorized practice of law.

In *Ford Motor*, we explained that there is a

"fundamental difference between an unlicensed individual representing a party in legal proceedings or performing activities traditionally considered to be the 'practice of law' and duly licensed attorneys who happen to belong to a law firm that has not filed its registration and paid its fees pursuant to Rule 721(c). The material inquiry in assessing whether there has been an unauthorized practice of law is whether the individual who acts on behalf of a client is duly licensed by this court, as it is only individuals—and not corporations—who are granted the privilege to practice law." *Ford Motor*, 214 Ill. 2d at 387.

We also observed in *Ford Motor* that the public faced a risk of harm from unlicensed individuals engaging in the practice of law, and that an unregistered law firm did not pose a risk of harm to the public, but, rather, harmed itself. We noted that "[b]y failing to register, the law firm

loses its right to invoke the corporate protections of limited liability that are set forth in Rule 721." *Ford Motor*, 214 Ill. 2d at 388. We stated that this reality underscored "that the registration requirement in Rule 721(c) was not enacted to safeguard the public welfare, but to benefit those law firms seeking the tax and limited liability advantages of incorporation." *Ford Motor*, 214 Ill. 2d at 388. Accordingly, we held that "duly licensed attorneys who practice with a law firm that lacks Rule 721(c) registration do not, by virtue of the unregistered nature of the law firm, engage in the unauthorized practice of law." *Ford Motor*, 214 Ill. 2d at 390. Therefore, we concluded that it was error for the lower courts to hold that the award of attorney fees for the legal services rendered by the licensed attorney was null and void. As stated, we hold that this same reasoning is applicable in the matter at bar.

As a final matter, we briefly dispense with Blue Cross' argument that the appellate court's holding below that the Act's certificate of registration requirement is for the protection of the public is consistent with "Illinois' well established policy of ensuring that lay people are not controlling or influencing professional services." Citing to our decision in *Carter-Shields v. Alton Health Institute*, 201 Ill. 2d 441, 445 (2002), Blue Cross observes that the corporate practice of medicine doctrine prevents persons or entities that are not licensed by this state from providing physician or other medical services, or from excessively influencing the delivery of those services. Therefore, Blue Cross argues, if an entity such as plaintiff has not complied with the Act's certificate of registration requirement before offering professional services to the public, that entity has avoided requirements that were enacted to protect the public from the concerns that underlie the prohibition of the corporate practice of medicine, *i.e.*, that "the Department [must] determine[ ]

that lay people did not own or control the corporate enterprise that was providing podiatric services and that none of the owners had disciplinary proceedings pending against them."

We reject Blue Cross' assertion that the corporate practice of medicine doctrine has application to this case. First, the appellate court below did not mention this doctrine, or *Carter-Shields*, the case relied upon by Blue Cross. The undisputed evidence shows that Dr. Mitchell Rosner, who has always been the sole officer, director and shareholder of plaintiff, as well as all other podiatric physicians employed by plaintiff, have been duly licensed podiatrists. Plaintiff was never owned or operated by a layperson. Thus, there is no danger of "lay control over professional judgment and the division of a physician's loyalties which underpin the prohibition against the corporate practice of medicine." *Carter-Shields*, 201 Ill. 2d at 461. These concerns cannot apply to a validly incorporated professional corporation like plaintiff that is owned and operated by licensed medical professionals. *Riggs*, 351 Ill. App. 3d at 277. Because these dangers do not, and cannot, exist under the facts presented here, both the corporate practice of medicine doctrine and our decision in *Carter-Shields* are inapposite to the instant cause. We agree with the court in *Riggs* that "*Carter-Shields* is 'miles removed from the situation at issue in the present case,' " which involves a professional service corporation's failure to obtain a certificate of registration under the Act. *Riggs*, 351 Ill. App. 3d at 277.

## CONCLUSION

For the foregoing reasons, the judgments of the circuit and appellate courts are reversed and the cause is remanded to the circuit court.

*Judgments reversed;*
*cause remanded.*